UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE BOEING COMPANY, )<br><br>Plaintiff, )<br><br>v. )<br><br>U.S. DEPARTMENT OF THE<br>AIR FORCE, )<br><br>Defendant. ) | Civil Action No. 05-365 (GK) |

<u>MEMORANDUM OPINION</u>

Plaintiff The Boeing Company ("Boeing") brings this action against Defendant United States Department of the Air Force Space and Missile Systems Center ("Air Force") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended by the Freedom of Information Act of 1986 ("FIRA"), Pub.L. No. 99-570, § 1801-04, 100 Stat. 3207-48, 48-50; the Trade Secrets Act, 18 U.S.C. § 1905; and the Administrative Procedure Act, 5 U.S.C. § 702.

The present matter is before the Court on Defendant's Motion for Summary Judgment [Dkt. No. 20], and Plaintiff's Motion for Summary Judgment [Dkt. No. 21].

Upon consideration of the Motions, Oppositions, the entire record herein, and for the reasons set forth below, Defendant's Motion for Summary Judgment is **granted**, and Plaintiff's Motion for Summary Judgment is **denied.**

I.   **Background**[1]

The Global Positioning System ("GPS") is a "space-based radio-positioning system" that depends on a "24-satellite constellation that provides navigation and timing information to military and civilian users."  Pl.'s Mot. for Summ. J. at 1.  It has become increasingly widespread as a mapping tool in cars, cell phones, and fitness monitors used by runners and cyclists.

The technology depends upon a network of satellites that are updated and replaced over time.  Id. at 2.  There have been four generations of satellites: Block I, Block II, Block IIA, and Block IIR.  Id.

After a competitive procurement in April 1996, the Air Force awarded the production contract for the Block IIF "next generation" satellites to Boeing.  Id.  The contract provided for Boeing to build and launch six satellites and included options for twenty-seven more.  Id.  In March 2000, the Air Force decided not to exercise all twenty-seven options.  It contracted with Boeing to build the first twelve satellites and put the other fifteen contracts out for competitive bidding.  Id.

---

[1]   Unless otherwise noted, the facts set forth herein are undisputed.  These facts are typically drawn primarily from the parties' Statements of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h).  However, in this case, only Defendant submitted a Statement of Undisputed Material Facts to accompany its Motion for Summary Judgment.  Plaintiff responded to Defendant's Statement [Dkt. No. 28], but submitted its Motion for Summary Judgment without including its own Statement of Material Facts.

On January 22, 2004, the Air Force received a FOIA request from Federal Sources, Inc.  Federal Sources is a fee-based commercial service that submits FOIA requests on behalf of companies or individuals.  Boeing believes that the requestor is Boeing's major competitor, Lockheed Martin.

The request sought a copy of Air Force contract F4701-96-C-0025, all modifications to that contract, and the Source Selection Decision Document.  The contract was awarded in 1996 and will continue through 2012.  Federal Sources subsequently agreed to accept a conformed version of the contract in place of the original contract and all modifications.[2]

Boeing was notified of this request by a letter from the Air Force dated January 28, 2004.  On March 31, 2004, Boeing responded to the request for the Source Selection Decision Document.  The parties subsequently resolved their differences about this document, so it is not an issue in this litigation.

On April 12, 2004, Boeing submitted its objections to the release of the pricing information or wrap-around rates contained in sections B and H of the contract.  Specifically, Boeing objected to the release of information in Sections H.17, H.23, and H.24, as well as the following contract line item numbers ("CLINs") in

---

[2]  Boeing used the term "conformed" in its Motion.  Pl.'s Mot. for Summ. J. at 4.  Neither party defined the term.

section B: CLINs 7, 16, 23, 40, 41, 43, and 45.[3]  Boeing objected
only to the release of rates, not to the release of the total
contract price.  Pl.'s Opp'n at 21.  Boeing emphasized in all its
pleadings that it is opposed to disclosing "wrap rates," i.e.,
rates that combine an employee's wages, employer-paid taxes,
benefits, and allocated overhead costs.  Id. at 23.  The wrap rates
include "labor rates, profit rates, or the combination of the two
-- and any information that would enable a competitor to derive
those rates."  Id. at 21.

On October 22, 2004, the Air Force responded that information
from 1996 through 2004 could not be used to produce projections
with "sufficient validity to cause a likelihood of substantial
competitive harm."  It also agreed not to release information from
2005 through 2012.

On December 2, 2004, Boeing submitted additional comments.  It
agreed to the release of pricing information for the years 1996
through 1999.  However, it objected to the release of such data for
the 2000-2004 period on the ground that it could be used to predict
Boeing's future labor rates.

On January 25, 2005, the Air Force issued its Final
Administrative Decision Letter ("Decision Letter").  The Decision

---

[3]  CLINs are "composed predominantly of the costs of materials
and services [Boeing] procures from other vendors."  McDonnell
Douglas v. Dep't of the Air Force, ("McDonnell Douglas II"), 375
F.3d 1182, 1190 (D.C. Cir. 2004).

Letter indicated that the Air Force would release all requested pricing information for the period between 1996 and 2004 within two weeks of that date, although it agreed not to release prices for the years 2005-2012.   The Decision Letter also indicated that Boeing was required to submit proposed unit prices when it submitted its contract bid and that Boeing had failed to establish that release of the requested information would be likely to cause substantial harm to Boeing's competitive position.

On February 16, 2005, Boeing responded to the Decision Letter, stating its disagreement with the agency's decision.   On February 23, 2005, the Air Force responded further, stating that it had been careful in reaching its decision and indicating that it planned to release the contract, including the disputed information in sections B and H, for all years prior to 2005.

On that same date, Boeing filed its Complaint for Declaratory and Injunctive Relief.   On August 18, 2005, a stay was ordered until December 28, 2005 to permit Boeing to submit comments in response to the Air Force's February 23, 2005 letter and to allow the Air Force to reply.   Boeing submitted its comments on November 23, 2005, and the Air Force issued a final agency decision on December 27, 2005.   In this final decision, the Air Force reiterated its view that the requested information could be released for the years between 1996 and 2004.

## II.   Standard of Review

FOIA "requires agencies to comply with requests to make their records available to the public, unless the requested records fall within one or more of nine categories of exempt material." Oglesby v. Dep't of the Army, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (citing 5 U.S.C. §§ 552(a), (b)).

In a FOIA case, the district court conducts a de novo review of the government's decision to withhold requested documents under any of the statute's nine exemptions.  5 U.S.C. § 552(a)(4)(B).  An agency that withholds information pursuant to a FOIA exemption bears the burden of justifying its decision.  Petroleum Info. Corp. v. Dep't of the Interior, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing 5 U.S.C. § 552(a)(4)(B)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  In this Circuit, an agency is obligated to submit a so-called "Vaughn Index," an index of all responsive material it has withheld, either in whole or in part, under a FOIA exemption.  Vaughn v. Rosen, 484 F.2d 820, 826-28 (D.C. Cir. 1973).

In a FOIA case, a court may award summary judgment solely on the basis of information provided in affidavits or declarations when they (1) "describe the documents and the justifications for nondisclosure with reasonably specific detail"; (2) "demonstrate that the information withheld logically falls within the claimed exemption"; and (3) "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."

Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).

Because this action is a challenge to an agency's decision to disclose documents, it, like other agency actions, is reviewed under the arbitrary and capricious standard of the Administrative Procedure Act ("APA").  See 5 U.S.C. § 706(2)(A).  The agency's decision must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Canadian Commercial Corp. v. Dep't of the Air Force, 514 F.3d 37, 39 (D.C. Cir. 2008).  An agency's decision is arbitrary when it provides no "empirical support" for its assertions, id. at 40, when it suffers from "shortfalls in logic and evidence," Canadian Commercial Corp. v. Dep't of the Air Force, 442 F. Supp. 2d 15, 39 (D.D.C. 2006), or when it "fail[s] to explain how its knowledge or experience supports" its decision, McDonnell Douglas v. Dep't of the Air Force, ("McDonnell Douglas II"), 375 F.3d 1182, 1191 (D.C. Cir. 2004).

## III. Analysis

### A.    FOIA's Exemption 4 and the Trade Secrets Act

FOIA "mandates a strong presumption in favor of disclosure." Multi Ag Media LLC v. Dep't of Agriculture, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (internal quotation marks omitted).  Nonetheless, as noted earlier, an agency may withhold information that falls within one of the statute's nine enumerated exemptions.  August v.

FBI, 328 F.3d 697, 699 (D.C. Cir. 2003).  These exemptions were "designed to protect those legitimate governmental and private interests that might be harmed by release of certain types of information." Id. (internal quotation marks omitted).  Yet because the statute favors disclosure, the exemptions "must be narrowly construed."  Multi Ag Media LLC, 515 F.3d at 1227 (internal quotation marks omitted).

FOIA's Exemption 4 protects "matters that are . . . trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4). Commercial information is considered "confidential" under the statute if "disclosure would . . . cause substantial harm to the competitive position of the person from whom the information was obtained."  Canadian Commercial Corp., 514 F.3d at 39 (quoting Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974)) (internal punctuation omitted).

To meet this standard, a plaintiff is not required to prove that substantial harm is "certain" to result from disclosure, but only that such harm is "likely." McDonnell Douglas II, 375 F.3d at 1187.  Even so, a plaintiff must provide "specific factual or evidentiary material" to support his claim that harm is likely to result.  Nat'l Parks & Conservation Ass'n v. Kleppe, 547 F.2d 673, 679 (D.C. Cir. 1976) (quoting Pacific Architects & Eng'rs, Inc. v. The Renegotiation Board, 505 F.2d 383, 385 (D.C. Cir. 1974)).  For

8

example, in <u>McDonnell Douglas v. NASA</u>, 180 F.3d 303, 371 (D.C. Cir. 1999) ("<u>McDonnell Douglas I</u>"), the court found that McDonnell Douglas had shown, "as much as anyone can show before the event," that disclosure would result in competitive harm.  180 F.3d at 371-72.

To prove that information is likely to cause substantial harm to a plaintiff's competitive position, a plaintiff need not prove actual competitive harm.  <u>Gulf & W. Indus. v. United States</u>, 615 F.2d 527, 530 (D.C. Cir. 1979); <u>see also</u> <u>Nat'l Parks & Conservation Ass'n</u>, 547 F.2d at 683.  Instead, "[a]ctual competition and the likelihood of substantial competitive injury is all that need be shown."  <u>Gulf & W. Indus.</u>, 615 F.2d at 530 (citing <u>Nat'l Parks</u>, 547 F.2d at 673).

Release of requested information is likely to cause substantial competitive harm if disclosure would allow a company's competitors to "accurately calculate" its "future bids and its pricing structure" so that they could "estimate and undercut its bids."  <u>Gulf & W. Indus.</u>, 615 F.2d at 530 (internal punctuation omitted); <u>see</u> <u>Nat'l Parks</u>, 498 F.2d at 770 (finding a likelihood of substantial competitive harm when disclosure would potentially enable competitors to underbid the plaintiff); <u>see</u> <u>McDonnell Douglas II</u>, 375 F.3d at 1189 (finding a likelihood of substantial competitive harm when disclosure would "significantly increase the probability that competitors would underbid" plaintiff).

Courts may not impose a _per se_ rule that in all cases prohibits or requires the release of one particular type of information.  _Canadian Commercial Corp._, 514 F.3d at 41. Accordingly, this Circuit has held that Exemption 4 may apply to line-item pricing in some, but not necessarily all, cases.  _Id._  In others, Exemption 4 may not apply if the plaintiff fails to demonstrate that releasing the information would result in competitive harm.  _Id._ (distinguishing three cases relied on by the agency because they either involved previously-disclosed information or because the contractor had failed to show that disclosure would "enable a rival to reverse-engineer competitively sensitive information").

Thus, in the absence of a _per se_ rule, the set of facts in each case must be evaluated independently to determine whether the particular information at issue could cause substantial competitive harm if it were released.  _See_ _id._

Exemption 4 does not prohibit an agency from disclosing information; instead, it merely gives an agency permission to elect to withhold information.  _McDonnell Douglas II_, 375 F.3d at 1185. However, when information falls within Exemption 4, the Trade Secrets Act compels an agency to withhold it.  _Canadian Commercial Corp._, 514 F.3d at 39; _see also_ _McDonnell Douglas II_, 375 F.3d at 1185.  The Trade Secrets Act is a criminal statute that prevents Government personnel from disclosing certain types of confidential

information, and the D.C. Circuit has "long held" that the Trade Secrets Act is "at least co-extensive with Exemption 4 of FOIA." Canadian Commercial Corp., 514 F.3d at 39 (quoting CNA Fin. Corp. v. Donovan, 830 F.2d 1132, 1151 (D.C. Cir. 1987)).  Thus, the Trade Secrets Act "effectively prohibits an agency from releasing information subject to the exemption."  McDonnell Douglas II, 375 F.3d at 1186.

### B.   The Air Force's Decision Was Not Arbitrary and Capricious Because Boeing Has Not Established that It Is Likely to Suffer Substantial Competitive Harm

The parties agree on a substantial number of issues in this case.  They agree that the requested information cannot be released if it is likely to produce substantial harm to Boeing's competitive position,[4] that information between 2005 and 2012 cannot be released,[5] and that information prior to 2000 can be released.[6]

Accordingly, the parties' disagreement is a narrow one, limited to one principal issue: whether disclosure of pricing information from the period between 2000 and 2004 would be likely to result in substantial competitive harm to Boeing.

---

[4]   See Def.'s Mot. for Summ. J. at 14 (stating that Boeing must prove that disclosure is likely to cause substantial competitive harm).

[5]   In a letter dated October 22, 2004, the Air Force conceded that it would not release information for the years 2005-2012. Pl.'s. Mot, Exh. K at 1.

[6]   See Pl.'s Mot. for Summ. J. at 7 ("By letter dated December 2, 2004, Boeing agreed to release of the information for the years 1996 through 1999.").

Boeing contends that releasing the requested pricing information would likely result in substantial harm to its competitive position because it would permit underbidding by its competitors. It argues that the "most significant <u>unknown</u>" factor in determining a company's likely bid is its labor rate information. Pl.'s Opp'n at 4 (emphasis in original). Throughout this litigation, Boeing has argued that if its competitors obtained the requested information, they would be "in a good position to make an extremely good judgments [sic] regarding Boeing's future bid prices and thereby underbid Boeing." Pl.'s Mot. for Summ. J. at 17 (claiming that a competitor would be able to predict Boeing's "likely pricing for similar, future defense procurements"); <u>id.</u> (disclosing the wrap rate information would "significantly increase the probability" that its competitors would underbid Boeing) (quoting <u>McDonnell Douglas II</u>, 375 F.3d at 1189); <u>id.</u>, Exh. M (citing Oswald Decl.); <u>id.</u> at Exh. N (Terry Decl., stating that "[w]ith knowledge of Boeing's labor rates, a shrewd competitor can estimate with reasonable accuracy Boeing's likely pricing information for similar, future defense procurements").

The Air Force reviewed the change in rates over time and determined that they did not follow a linear progression. <u>Id.</u> Instead, they either "rose at uneven rates" or "rose and fell from year to year." <u>Id.</u> Consequently, the Air Force concluded that future prices cannot be extrapolated from the information in

question, Def.'s Opp'n at 4, and therefore releasing the information would not enable Boeing's competitors to estimate "likely pricing for similar, future defense procurements."

Boeing interprets this argument to imply that the Air Force is attempting to "impose[] a standard of its own creation, an 'unascertainable variables' standard." See Pl.'s Opp'n at 7. Boeing claims that the Air Force derives this standard from Acumenics Research & Tech. v. Dep't of Justice, 843 F.2d 800 (4th Cir. 1988). It further argues that this standard is not controlling in the D.C. Circuit and that it is directly contrary to cases like McDonnell Douglas I and McDonnell Douglas II.

However, Boeing misconstrues the Air Force's claim and ignores the clear direction given by the court in McDonnell Douglas II. The Air Force argues that existence of "too many fluctuating variables" is only one factor to be evaluated in determining whether substantial competitive harm would be likely to result. See Def.'s Mot. for Summ. J. at 14-17. It does not argue that the "unascertainable variables" standard should control, but rather that the requested information -- labor rates for past years -- would not, in this particular case, enable a competitor to derive the likely labor rates for future years.

Case law in this Circuit clearly states that a court may consider the presence of "unascertainable" or "fluctuating" variables as one relevant element in that inquiry, even though

13

"pinpoint precision is not required."  See McDonnell Douglas II, 375 F.3d at 1192-93.  But, as the Air Force acknowledges, the test is a broader one: whether the release of information could allow a competitor to extrapolate data that would likely cause substantial competitive harm.  See id. at 1192-93 (rejecting a per se rule and holding that the presence of "unascertainable" variables is not sufficient to establish that substantial harm is unlikely).

Accordingly, the critical question is whether some logical, consistent pattern exists that would permit extrapolation by a competitor.  In cases in which a court has found a likelihood of substantial competitive harm, the link between the release of information and the possibility of harm has been clear.

For example, in McDonnell Douglas II, option year prices were not identical to the final prices because they were subject to revision by the Economic Price Adjustment Clause.  375 F.3d 1182 at 1188 (internal quotation marks omitted).  However, because the Adjustment Clause was publicly available and explicitly set out the index used to determine the final prices, it was only a "matter of simple arithmetic" to determine the exact final prices.  Id.  The ability to calculate these adjusted option year prices would then "significantly increase the probability" that the company's competitors would underbid it.  Id. at 1189.

This Circuit has reached the opposite conclusion when a party has provided no convincing, demonstrated link between requested

14

information and data that would be likely to cause substantial competitive harm.  For example, unlike option prices, the vendor prices in <u>McDonnell Douglas II</u> did not pose a threat of substantial competitive harm.  <u>Id.</u> at 1192.  Although McDonnell Douglas had introduced newspaper articles from 1996 that reported employee salaries, it had presented "neither a viable theory nor any evidence" about how this information might be used to calculate a Labor Pricing Factor.  <u>Id.</u>  Without more certainty about the cost of benefits and about the prevailing wage for McDonnell Douglas employees performing work under this specific contract and at this specific location, the connection between the requested information and the Labor Pricing Factor was too attenuated.  <u>Id.</u>

Here, release of past labor rates is not problematic in itself.  For Exemption 4 purposes, releasing them would only threaten a company's competitive position to the extent they can be used to predict future labor rates and thereby enable underbidding by a company's competitors.  Boeing argues that such extrapolation is possible and that its views and expertise are entitled to deference on the issue.  It further contends that the Government set an "unreasonably high" standard for demonstrating a likelihood of competitive harm.  Pl.'s Mot. for Summ. J., Exh. M ("[W]e struggle to determine how we can prove, to the level of certitude [the Government] seems to desire, that Boeing is likely to suffer competitive harm from releasing this information.").  Boeing also

argues that the Air Force failed to consider the evidence it presented.

To substantiate its allegation that release of the requested information would allow a competitor to extrapolate future rates, Boeing provides a chart that purportedly shows that a competitor armed with the requested pricing information could estimate the annual "percent increase factor." Pl.'s Mot. for Summ. J., Exh. M. According to Boeing, the chart demonstrates that "a competitor could use simple arithmetic to estimate within pennies the 2005-2012 rates" for CLIN 45. Pl.'s Opp'n at 12.

A plaintiff need not demonstrate that the release of information would allow a competitor to "model exactly or to pinpoint precisely" information that would cause substantial harm. McDonnell Douglas II, 375 F.3d at 1193. Nonetheless, the plaintiff bears the burden of showing that such harm is likely to result. To satisfy its burden, a plaintiff must provide more than "mere conclusory opinion testimony," and he must support his claims with "specific factual or evidentiary material." Nat'l Parks, 547 F.2d 673, 679 (D.C. Cir. 1976) (quoting Pacific Architects & Eng'rs, Inc. v. The Renegotiation Board, 505 F.2d 383, 385 (D.C. Cir. 1974)).

Boeing falls short of satisfying this burden for three reasons. First, Boeing provides a chart for only one piece of data: H.23. It does not provide a similar analysis for any of the

16

other sections of the contract that were requested, i.e. H.17, H.24, and CLINs 7, 16, 23, 40, 41, 43, and 45. There is no evidence in the administrative record that demonstrates how the release of these other sections of the contract could be used to generate data that would harm Boeing's competitive position. Despite Boeing's allegation that releasing the requested information would place a competitor in a "good position" to make a "good judgment," it fails to demonstrate, for the overwhelming majority of the requested information, how it would be possible for a competitor to make these "good judgments."

Second, the Air Force contends that as to other portions of the requested information, such as the CLINs under H.23, "the rates for the most part do not fluctuate in a linear fashion." Pl.'s Mot. for Summ. J., Exh. T. It concluded that "there is nothing reliable about using past labor rate data to predict current labor rates to be bid on a current competition" and that "the age and unpredictability of these wrap labor rates demonstrate that they are not accurate predictors of labor rates that would be bid in a current competition." Id.

In its Revised Agency Final Decision of December 27, 2005, the Air Force shows that for CLINs 40, 41, 42, 43, and 47, the fluctuation from year to year does not follow a discernible pattern. Pl.'s Mot. for Summ. J., Exh. T. Sometimes they increase. Sometimes they decrease. Even when they move in one

17

direction, they often move by non-linear increments, such as a particular percent increase one year, followed by a different percent increase the following year.  Because Boeing has not provided evidence showing precisely how the release of this information could be used to cause substantial competitive harm, it fails to refute the Air Force's claims.

Third, Boeing's argument about the predictive value of the chart is premised on its claim that price increases are constant. Pl.'s Mot. for Summ. J., Exh. M (chart includes two separate columns for constant terms: "Constant % incr Factor" and "Constant fee %").  It states specifically that if competitors obtain pricing data "reaching back several years (i.e. to 1996)," then competitors will be able to derive this "increase factor," which in turn would permit them to underbid Boeing in the future.  Id. (emphasis added).

Yet Boeing does not explain why it has agreed that information from 1996 to 1999 can be released if it could presumably be used -- just like information from 2000 to 2004 -- to derive the "constant term."  Boeing's different conclusions with respect to the two periods of information appear contradictory: if Boeing is correct that a constant term can be derived from only a few years of data and can be used to cause competitive harm, then the 1996-1999 information would be just as harmful as the 2000-2004 information. This contradiction suggests that Boeing is either overstating the

ease of deriving the constant term or overstating the likelihood that it will be harmed by the release of 2000-2004 information.

Despite neglecting to explain the discrepancy in its own treatment of information in the 1996-1999 period and the 2000-2012 period, Boeing argues that the Air Force's decision was arbitrary and capricious because it treated the data for the period between 2005 and 2012 differently from the data for the period between 1996 and 2004.

At the time this dispute arose, release of the 2005-2012 information would have provided competitors with an exact future rate.  Releasing data from the 2005-2012 period therefore would have permitted competitors to underbid Boeing.  Releasing past data from 1996 to 2004, in contrast, would only harm Boeing to the extent that it could be used to extrapolate future data.  As discussed supra, the Air Force concluded that this past data could not be used to reliably predict future data.  Therefore, the Air Force did not act arbitrarily when it treated information from the 1996-2004 period differently from information from the 2005-2012 period.

For these reasons, Boeing has not offered evidence sufficient to carry its burden to show that the Air Force acted arbitrarily and capriciously when it determined that Boeing is not likely to

suffer substantial competitive harm.[7]

## IV.   Conclusion

For the reasons set forth above, the Air Force's decision was neither arbitrary nor capricious.  Accordingly, Defendant's Motion for Summary Judgment is **granted,** and Plaintiff's Motion for Summary Judgment is **denied.**   An Order shall accompany this Memorandum Opinion.


May 18, 2009                          /s/_____
                                      Gladys Kessler
                                      United States District Judge


**Copies via ECF to all counsel of record**

---

[7]   Because the Court finds that the Air Force's decision on the likelihood of substantial competitive harm was not arbitrary and capricious, it is not necessary to determine whether the requested information was previously released.